**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 13, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MARKET SYNERGY GROUP, INC.,

    Plaintiff - Appellant,

v.

UNITED STATES DEPARTMENT OF
LABOR; R. ALEXANDER ACOSTA, in
his official capacity as Secretary of the
United States Department of Labor;
PHYLLIS C. BORZI, in her official
capacity as Assistant Secretary of the
United States Department of Labor,

    Defendants - Appellees.

---------------

AARP; AARP FOUNDATION;
AMERICANS FOR FINANCIAL
REFORM; BETTER MARKETS;
CONSUMER FEDERATION OF
AMERICA; NATIONAL EMPLOYMENT
LAW PROJECT; PUBLIC INVESTORS
ARBITRATION BAR ASSOCIATION,

    Amici Curiae.

No. 17-3038

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 5:16-CV-04083-DDC-KGS)**
_____

James F. Jorden (Brian P. Perryman of Carlton Fields Jorden Burt, P.A., Washington,
D.C.; Michael A. Valerio of Carlton Fields Jorden Burt, P.A., Hartford, Connecticut; J.
Michael Vaughan of Walters Bender Strohbehn & Vaughan, P.C., Kansas City, Missouri,
with him on the briefs), for Plaintiff - Appellant.

Michael Shih (Michael S. Raab and Thais-Lyn Trayer, Civil Division, U.S. Department of Justice; Hashim M. Mooppan, Deputy Assistant Attorney General, Tom Beall, United States Attorney; Of Counsel: Nicholas C. Geale, Acting Solicitor of Labor, G. William Scott, Associate Solicitor, Edward D. Sieger, Senior Attorney, Thomas Tso, Counsel for Appellate Litigation, and Megan Hansen, Attorney for Regulations, U.S. Department of Labor, Office of the Solicitor, with him on the brief), Washington, D.C., for Defendants - Appellees.

Mary Ellen Signorille and William Alvarado Rivera of AARP Foundation Litigation, Washington, D.C. for Amici Curiae.

_____

Before **LUCERO**, **KELLY**, and **MATHESON**, Circuit Judges.

_____

**KELLY**, Circuit Judge.

_____

Plaintiff-Appellant Market Synergy Group appeals from the district court's judgment in favor of Defendant-Appellee United States Department of Labor. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

**Background**

This case stems from the Department of Labor's (DOL) final regulatory action on April 8, 2016, as it applies to fixed indexed annuity (FIA) sales. See Amendment to and Partial Revocation of Prohibited Transaction Exemption (PTE) 84-24 for Certain Transactions Involving Insurance Agents and Brokers, Pension Consultants, Insurance Companies, and Investment Company Principal Underwriters (Final PTE 84-24), 81 Fed. Reg. 21,147 (Apr. 8, 2016) (to be codified at 29 C.F.R. pt. 2550).[1] Plaintiff-Appellant

_____

[1] While enforcement of the regulation has been postponed until July 1, 2019, see 82 Fed. Reg. 56,545 (Nov. 29, 2017), the DOL maintains that the rule's

2

Market Synergy Group (MSG) is a licensed insurance agency that works with insurers to develop specialized, proprietary FIAs and other insurance products for exclusive distribution. It partners with independent marketing organizations[2] (IMOs) to distribute these products. MSG does not directly sell FIAs but conducts market research and provides training and products for IMO member networks and the independent insurance agents that IMOs recruit. Market Synergy and its 11 IMO network members had $15 billion in FIA sales in 2015 and substantially all of Market Synergy's revenues involve developing, marketing, and distributing FIAs. Aplt. Br. at 7–8.

Annuities are investments, often for retirement, sold by financial institutions including life insurers. An annuity involves a promise to pay amounts on a regular basis for a set period of time. Deferred annuities have a deferral or accumulation phase where the contract accumulates value through premiums paid and interest credited. The payout phase occurs when the contract holder receives a set stream of payments, for example, upon attaining a certain age. What that interest will be during the deferred phase generally separates the three types of annuities at issue in this case — fixed rate (or fixed declared rate), fixed indexed, and variable.[3]

In a fixed rate annuity, the insurer guarantees a return of principal and minimum crediting rate during the deferral or accumulation phase. When the annuity reaches the

___

substantive provisions will remain unchanged, see Aplee. Supp. Authority (filed Nov. 30, 2017).

[2] An IMO is essentially an intermediary between insurers and independent agents. Insurers generally pay IMOs a commission based on the amount of sales generated by independent agents. IMOs in turn often pay a predetermined percentage to the independent agent.

[3] As we will see later, the difference is not so simple.

payout phase, minimum payments are based upon rates guaranteed at issuance.  In contrast, a variable annuity's return is not guaranteed but rather based upon the returns or losses of the underlying assets in which the funds are invested.  Variable annuities are securities.

A fixed indexed annuity falls somewhere in-between a fixed rate and variable annuity.  Like a fixed rate annuity, principal and prior credited interest are protected from market downturns.  Like a variable annuity, however, the amount of interest actually credited varies based on a market index the FIA is tied to, such as the S&P 500 index.  Unlike a variable annuity though, FIAs are not actually invested in the market; rather, the market index's performance is used simply as a reference to determine the amount of interest credited.  The crediting rate for an FIA is never less than zero.  FIAs, like fixed rate annuities, generally are governed by state insurance law and are exempt from federal securities law.

When an investor speaks with an insurance agent about buying an annuity, that insurance agent will often give advice and receive a commission for selling the annuity.  This conduct is governed under Title II of the Employee Retirement Income Security Act (ERISA) and the Internal Revenue Code, which broadly defines a fiduciary as someone who "renders investment advice for a fee."[4]  26 U.S.C. § 4975(e)(3)(B).  These insurance agents selling annuities would generally be classified as fiduciaries and therefore be

---

[4] The DOL established a five-part test in 1975 defining when a person "renders investment advice," but modified that definition as part of the current regulation at issue in this case.  See Definition of the Term "Fiduciary"; Conflict of Interest Rule — Retirement Investment Advice, 81 Fed. Reg. 20,946 (Apr. 8, 2016) (to be codified at 29 C.F.R. pts. 2509, 2510, 2550).

4

barred from receiving commissions; however, they are exempt from that prohibition under a Department of Labor rule — Prohibited Transaction Exemption (PTE) 84-24.[5]

In April 2015, the DOL issued a proposed rule redefining who is a "fiduciary" of an employee benefit plan under ERISA and the Internal Revenue Code, which would "update existing rules to distinguish more appropriately between the sorts of advice relationships that should be treated as fiduciary in nature and those that should not." Proposed Amendment to and Proposed Partial Revocation of Prohibited Transaction Exemption (PTE) 84-24 for Certain Transactions Involving Insurance Agents and Brokers, Pension Consultants, Insurance Companies and Investment Company Principal Underwriters (Proposed PTE 84-24), 80 Fed. Reg. 22,010, 22,011 (Apr. 20, 2015) (to be codified at 29 C.F.R. pt. 2550). The final rule contained two changes important to this case.[6] First, it created a new exemption, with added regulatory requirements, entitled the Best Interest Contract Exemption (BICE). Much like PTE 84-24, the BICE "would allow certain investment advice fiduciaries . . . to receive . . . compensation." Proposed Best Interest Contract Exemption (Proposed BICE), 80 Fed. Reg. 21,960, 21,961 (Apr. 20, 2015) (to be codified at 29 C.F.R pt. 2550). The BICE, however, also imposes a more stringent set of requirements on prohibited transactions than those required under PTE

---

[5] The DOL has the statutory authority to craft this exemption in accordance with 26 U.S.C. § 4975(c)(2) and Reorganization Plan No. 4 of 1978 (5 U.S.C. app. 243, 244 (2016)). To grant an exemption, the DOL need only find that the exemption is "(1) administratively feasible, (2) in the interests of the plan and of its participants and beneficiaries, and (3) protective of the rights of participants and beneficiaries of the plan." 26 U.S.C. § 4975(c)(2).

[6] MSG does not challenge the DOL's authority to issue the rule nor does it challenge the DOL's new definition of "fiduciary." Aplt. Br. at 2–3.

84-24.  See Final Best Interest Contract Exemption (Final BICE), 81 Fed. Reg. 21,002, 21,007 (Apr. 8, 2016) (to be codified at 29 C.F.R. pt. 2550).

Second, the DOL removed FIAs (as well as variable annuities) from the PTE 84-24 exemption and placed them in the newly created BICE.  Final PTE 84-24, 81 Fed. Reg. at 21,152–53.  Fixed rate annuities, however, were kept within the PTE 84-24 exemption.  The DOL's stated reason for this change was because FIAs (1) require the customer to shoulder significant investment risk, (2) "do not offer the same predictability of payments as Fixed Rate Annuity Contracts," (3) are "often quite complex," and (4) are "subject to significant conflicts of interest at the point of sale."  Final PTE 84-24, 81 Fed. Reg. at 21,152–53.  Those engaged in selling FIAs would now have to satisfy the conditions set forth in the BICE to be granted an exemption.

MSG then filed this suit under the Administrative Procedure Act (APA) and the Regulatory Flexibility Act (RFA).  Only the APA claim is at issue on appeal.  MSG claimed that the DOL violated the APA in three ways: (1) it failed to provide adequate notice of its intention to exclude transactions involving FIAs from PTE 84-24, (2) it arbitrarily treated FIAs differently from other fixed annuities by excluding FIAs from PTE 84-24, and (3) it did not adequately consider the detrimental economic impact of its exclusion of FIAs from PTE 84-24.  MSG alleged that it would lose 80% of its revenue if the new regulation were to be enforced and sought a preliminary injunction to prevent the DOL from implementing the new regulation.  The district court denied the preliminary injunction.  On cross-motions for summary judgment, the district court ruled in favor of the DOL, finding that there was adequate notice, no arbitrary treatment of FIAs as

6

compared to other fixed annuities, and an adequate economic impact analysis. MSG filed this timely appeal.

**Discussion**

The district court's grant of summary judgment is reviewed de novo. Cerveny v. Aventis, Inc., 855 F.3d 1091, 1095 (10th Cir. 2017). The APA grants federal courts the authority to review agency action, 5 U.S.C. § 702, and requires a court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," id. § 706(2)(A).

A.      The DOL Provided Sufficient Notice

MSG first argues that the DOL did not provide sufficient notice of the possible final rule in its Notice of Proposed Rule Making (NPRM). Agencies must provide "either the terms or substance of the proposed rule or a description of the subjects and issues involved," id. § 553(b)(3), which, in turn, "give[s] interested persons an opportunity to participate in the rule making through submission of" written comments, id. § 553(c).

While the agency must give notice of the rule it proposes to implement, "[i]t is a well settled and sound rule which permits administrative agencies to make changes in the proposed rule after the comment period without a new round of hearings." Beirne v. Sec'y of Dep't of Agric., 645 F.2d 862, 865 (10th Cir. 1981). The final rule must, however, be a "logical outgrowth" of the proposed rule. "A final rule qualifies as a logical outgrowth 'if interested parties "should have anticipated" that the change was

7

possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period.'" CSX Transp., Inc. v. Surface Transp. Bd., 584 F.3d 1076, 1079–80 (D.C. Cir. 2009) (quoting Ne. Md. Waste Disposal Auth. v. EPA, 358 F.3d 936, 952 (D.C. Cir. 2004)).

In the DOL's NPRM to amend and partially revoke PTE 84-24, the agency stated what it was considering: (1) removing "variable annuity contracts and other annuity contracts that are securities under federal securities laws" from the PTE 84-24 exemption and moving them to the new BICE exemption and (2) keeping fixed rate and FIA transactions "under [PTE 84-24], with the added protections of the Impartial Conduct Standards." Proposed PTE 84-24, 80 Fed. Reg. at 22,012, 22,015. The distinction was proper because "annuity contracts that are securities [(variable annuities)] . . . are distributed through the same channels as many other investments covered by the [BICE], and . . . the conditions of the proposed [BICE] are appropriately tailored for such transactions." Id. at 22,015.

The DOL, however, requested comment on the above approach: "In particular, the [DOL] requests comment on whether the proposal to revoke relief for securities transactions involving IRAs (i.e., annuities that are securities and mutual funds) but leave in place relief for IRA transactions involving insurance and annuity contracts that are not securities [(fixed rate annuities and FIAs)] strikes the appropriate balance and is protective of the interests of the IRAs." Id. (emphasis added).

8

MSG acknowledges, as it must, that the DOL asked for comment, but argues it was unclear on what specific topic comment was sought.[7] Aplt. Br. at 28. According to MSG, the DOL simply did not give notice that it might exclude FIAs from PTE 84-24 and therefore did not give adequate notice of the final rule. We are unpersuaded. The NPRM clearly asks for comment on whether removing variable annuities from PTE 84-24 but leaving FIAs and fixed rate annuities struck the appropriate balance. This provides a "description of the subjects and issues involved," 5 U.S.C. § 553(b)(3), and "give[s] interested persons an opportunity to participate in the rule making through submission of" written comments, id. § 553(c).[8] MSG could have commented that they thought the DOL had struck the appropriate balance by keeping FIAs within PTE 84-24, but failed to do so.

MSG also argues that the final rule was not a logical outgrowth of the proposed rule because interested parties could not have anticipated that the change was possible. See CSX Transp., Inc., 584 F.3d at 1079–80. Specifically, MSG reminds us that the DOL apparently intended to allow FIAs in amended PTE 84-24. But the DOL did not determine anything — it raised the issue and invited comment. Indeed, the "whole

---

[7] MSG also argues that the DOL failed to identify the standards by which they would distinguish FIAs from other fixed annuities. Aplt. Br. at 30. The question for this court, however, is not whether the agency provided every detail of how it would approach regulating fixed annuities versus variable annuities, but rather whether the final rule was a logical outgrowth of the proposed rule.

[8] Two other district courts have also held there was sufficient notice concerning this regulation. See Chamber of Commerce of the U.S. v. Hugler, 231 F. Supp. 3d 152, 185 (N.D. Tex. 2017), appeal docketed, No. 17-10238 (5th Cir. argued July 31, 2017); Nat'l Ass'n for Fixed Annuities v. Perez, 217 F. Supp. 3d 1, 48 (D.D.C. 2016), appeal docketed, No. 16-5345 (D.C. Cir. Nov. 28, 2016).

rationale of notice and comment rests on the expectation that the final rules will be somewhat different — and improved — from the rules originally proposed by the agency." Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Donovan, 757 F.2d 330, 338 (D.C. Cir. 1985). And while MSG may not have anticipated the final rule, other commenters read the NPRM as asking for comment on whether to keep FIAs and fixed rate annuities within PTE 84-24. Some commentators (including one of the IMOs in MSG's own network) suggested that FIAs be kept within PTE 84-24 while others advocated for their removal. Compare 7 Aplt. App. 1647 (Cmt. of Indexed Annuity Leadership Council), 1598–99 (Cmt. of Allianz Life Insurance Co. of North America), 1710–12 (Cmt. of Advisors Excel), with id. at 1674 (Cmt. of Fund Democracy); Aplee. Supp. App. 20 (Cmt. of Investor Rights Clinic), 79 (Cmt. of Prof. Ron Rhoades). While comments in and of themselves do not resolve the notice issue, they do suggest that various parties anticipated that the final rule might include an option to remove FIAs from PTE 84-24. We conclude that the NPRM gave sufficient notice and that the final rule was a logical outgrowth of the proposed rule.

B.      The DOL Did Not Arbitrarily Treat FIAs Differently from Fixed Annuities

MSG next argues that the DOL's action of retaining the PTE 84-24 exemption for fixed rate annuities, but moving FIAs to the BICE, was arbitrary and capricious for two reasons. First, it argues that FIAs are virtually indistinguishable from fixed rate annuities; therefore, separating them into different exemptions was arbitrary. Aplt. Br. at 39–41. Second, MSG argues that the DOL did not adequately take into account state regulation already in place. Id. at 45.

10

An agency's actions are arbitrary and capricious if it "entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency." Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Under this framework, a court will set aside the agency's "factual determinations only if they are unsupported by substantial evidence." Forest Guardians v. U.S. Fish & Wildlife Serv., 611 F.3d 692, 704 (10th Cir. 2010). A court applying the arbitrary-and-capricious standard of review must "ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." Kobach v. U.S. Election Assistance Comm'n, 772 F.3d 1183, 1196 (10th Cir. 2014) (quoting Aviva Life & Annuity Co. v. FDIC, 654 F.3d 1129, 1131 (10th Cir. 2011)). The scope of review "under this standard is 'narrow'" and "a court is not to substitute its judgment for that of the agency." Judulang v. Holder, 565 U.S. 42, 52–53 (2011) (quoting Motor Vehicle Mfrs., 463 U.S. at 43). The administrative record shows the DOL met this standard.

1. Fixed Rate Annuities Are Not Identical to FIAs

MSG argues that FIAs and fixed rate annuities are identical except for the amount of interest accrued and therefore the DOL's determination to separate them out into two different exemptions was arbitrary. The DOL received some comments to this effect (that FIAs are no different than fixed rate), but it also received comments stating that FIAs are more akin to variable annuities. See Final PTE 84-24, 81 Fed. Reg. at 21,156–57. After reviewing all of the comments, it acknowledged that "[f]ixed-indexed annuities fall between fixed-rate annuities and variable annuities in terms of the extent to which

11

insurers bear investment risks." 3 Aplt. App. 821. However, it ultimately determined, based on the record before it, that "the complexity, risk, and conflicts of interest associated with recommendations of . . . indexed annuity contracts" demonstrated that they were more akin to variable annuities and should therefore be treated as such.[9] Final PTE 84-24, 81 Fed. Reg. at 21,157–58. In making this determination, the DOL relied not only on industry comments but also on publications from the Financial Industry Regulatory Authority (FINRA) and Securities and Exchange Commission (SEC). See id. at 21,153–54.

a. Complexity

Concerning complexity, MSG argues that FIAs are no different than fixed rate annuities except for the "method of calculating interest credited to the annuity." Aplt. Br. at 41. But the DOL disagreed — it explained that for an investor to "assess[] the prudence of a particular indexed annuity," he or she must have an understanding of

> surrender terms and charges; interest rate caps; the particular market index or indexes to which the annuity is linked; the scope of any downside risk; associated administrative and other charges; the insurer's authority to revise terms and charges over the life of the investment; and the specific methodology used to compute the index-linked interest rate and any optional benefits that may be offered, such as living benefits and death benefits.

---

[9] The D.C. Circuit's holding in American Equity Investment Life Insurance Co. v. SEC, 613 F.3d 166 (D.C. Cir. 2010), further supports this distinction. There, the SEC had proposed regulations to exclude FIAs from the definition of "annuity contract" because of their similarity to securities. 613 F.3d at 174. The D.C. Circuit found that this interpretation was reasonable, which supports the conclusion that the DOL's interpretation is also reasonable. Id.

Final PTE 84-24, 81 Fed. Reg. at 21,154. The DOL also observed that, "[i]n operation, the index-linked interest rate can be affected by participation rates; spread, margin or asset fees; interest rate caps; the particular method for determining the change in the relevant index over the annuity's period (annual, high water mark, or point-to-point); and the method for calculating interest earned during the annuity's term (e.g., simple or compounded interest)." Id. The DOL amply supported its view that FIAs are more complex than fixed rate annuities.

b. Risk

Concerning risk, the DOL found that there was significant risk compared to fixed rate annuities: "Similar to variable annuities, the returns of fixed-indexed annuities can vary widely, which results in a risk to investors. Furthermore, insurers generally reserve rights to change participation rates, interest caps, and fees, which can limit the investor's exposure to the upside of the market and effectively transfer investment risks from insurers to investors." 3 Aplt. App. 821.

In MSG's view, FIAs are no more risky than fixed rate annuities because there is no possibility of a loss of principal. Aplt. Br. at 42. MSG's view is one shared by some commenters, see Final PTE 84-24, 81 Fed. Reg. at 21,157; however, it does not make the DOL's view arbitrary or capricious. According to the DOL, as supported by the record, because an FIA is a complex product where returns can be affected by a number of variables as discussed above, an FIA is a riskier investment than a fixed rate annuity, especially for retirees who depend on this income. 3 Aplt. App. 821, 982.

13

c. Conflicts of Interest

The DOL also determined that sales of FIAs involve more conflicts of interest than sales of other types of fixed annuity products. It explained that "the increasing complexity and conflicted payment structures associated with these [indexed] annuity products have heightened the conflicts of interest experienced by investment advice providers that recommend them." Final PTE 84-24, 81 Fed. Reg. at 21,154. In other words, because indexed annuities are more complex than fixed rate annuities, "retirement investors are acutely dependent on sound advice that is untainted by the conflicts of interest posed by advisers' incentives to secure the annuity purchase, which can be quite substantial." Id.

The DOL considered both sides of this issue and ultimately decided to treat FIAs differently than fixed rate annuities because of their risk, complexity, and conflicts of interests. It did so with evidentiary support in the record. It is not this court's role to "displace the [agency's] choice between two fairly conflicting views." See Forest Guardians, 611 F.3d at 704 (alteration in original) (quoting Wyoming Farm Bureau Fed'n v. Babbitt, 199 F.3d 1224, 1231 (10th Cir. 2000)).

2. The DOL Was Not Dismissive of State Regulation

MSG also claims that the DOL unreasonably infringed on an area of State concern, thereby missing an "important aspect of the problem." But the DOL did consider this aspect of the problem. It noted that there was not a uniform standard adopted by all the states and this was "particularly concerning" for complex and risky products such as FIAs. 3 Aplt. App. 740. It surveyed the state regulations and

14

sought to ensure that the "requirements of this exemption work cohesively with the requirements currently in place." Final BICE, 81 Fed. Reg. at 21,018. Because the agency adequately considered the issue, its decision was not arbitrary or capricious.

C.    Economic Impact Analysis

Finally, MSG contends that the DOL violated the APA by failing to consider how the regulation would affect the FIA industry. According to MSG, this new regulation will cost billions of dollars and could potentially put the entire FIA industry out of business. Aplt. Br. at 8, 50. MSG also argues that, much like the SEC in American Equity Investment Life Insurance Co. v. SEC, 613 F.3d 166 (D.C. Cir. 2010), and the EPA in Michigan v. EPA, 135 S. Ct. 2699 (2015), the DOL has a statutory requirement in 29 U.S.C. § 1135 to proscribe only "necessary or appropriate regulations," and therefore our review should be more probing. Aplt. Br. at 49–50. But the DOL did not rely on that statutory provision — instead, it used its broad statutory authority under 26 U.S.C. § 4975(c)(2) to craft an exemption to the fiduciary rule.[10] Final PTE 84-24, 81 Fed. Reg. at 21,148 n.2. Therefore, our review is limited to the arbitrary or capricious standard in which we must "ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." Kobach, 772 F.3d at 1196 (quoting Aviva Life, 654 F.3d at 1131). The DOL met this standard.

In its Regulatory Impact Analysis, the DOL addressed the effect implementation of the BICE would have on the insurance market. While it found that some in the

---

[10] This authority was transferred to the Secretary of the DOL from the Secretary of the Treasury under Reorganization Plan No. 4 of 1978. 5 U.S.C. app. 243, 244 (2016).

insurance market would be affected, it predicted that firms "will gravitate toward structures and practices that efficiently avoid or manage conflicts to deliver impartial advice consistent with fiduciary conduct standards."  4 Aplt. App. 1008.  Concerning FIAs in particular, it took into consideration the fact that the FIA market relies "heavily" on independent insurance agents.  Id. at 802.  It acknowledged, as argued by MSG, that some "may incur some costs to find, acquire, and adjust to new services and products." Id. at 1007.  It ultimately concluded that this fear was overstated and counteracted by the benefit to investors.  The DOL predicted that new markets would open, the regulation would promote innovation, and it would save investors millions of dollars by reducing or curtailing conflicted advice from fiduciaries.  Id. at 1016–17, 1023.  Relying on the record before it, the DOL could reasonably conclude that the benefits to investors outweighed the costs of compliance.[11]  See id. at 865–66, 983–84, 1024–25.  The DOL's decision was not arbitrary or capricious.

AFFIRMED.

---

[11] The DOL acknowledged that compliance costs under BICE would be "between $34.0 million and $37.8 million over ten years," but balanced this cost with the added protections to investors and its analysis that BICE costs would decrease significantly after the first year.  4 Aplt. App. 983–84.