# Illinois Official Reports

## Supreme Court

---

### *Van Dyke v. White*, 2019 IL 121452

---

| | |
|---|---|
| Caption in Supreme Court: | RICHARD LEE VAN DYKE, Appellee, v. JESSE WHITE, Secretary of State, State of Illinois, Appellant. |
| Docket No. | 121452 |
| Filed | March 21, 2019 |
| Decision Under Review | Appeal from the Appellate Court for the Fourth District; heard in that court on appeal from the Circuit Court of Sangamon County, the Hon. John W. Belz, Judge, presiding. |
| Judgment | Appellate court judgment affirmed.<br>Circuit court judgment reversed. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield (David L. Franklin, Solicitor General, and Christopher M.R. Turner, Assistant Attorney General, of Chicago, of counsel), for appellant.<br><br>William P. Hardy and Michael D. Morehead, of Hinshaw & Culbertson LLP, of Springfield, for appellee.<br><br>Kirk W. Dillard, Julie L. Young, and Hugh S. Balsam, of Locke Lord LLP, of Chicago, for *amicus curiae* Fidelity & Guaranty Life Insurance Company. |

E. King Poor, Gary R. Clark, and Charles E. Harper, of Quarles & Brady LLP, of Chicago, for *amicus curiae* National Association for Fixed Annuities.

Roland C. Goss and Jason R. Brost, of Carlton Fields Jorden Burt, P.A., of Washington, D.C., for *amicus curiae* American Council of Life Insurers.

Deanna Besbekos-LaPage, of Stoltmann Law Offices, of Barrington, Royal B. Lea III, of Bingham & Lea, P.C., of San Antonio, Texas, Braden W. Sparks, of Braden W. Sparks, P.C., of Dallas, Texas, and Melinda J. Steuer, of Sacramento, California, for *amicus curiae* Public Investors Arbitration Bar Association.

Christopher D. Galanos, of Quinn, Johnston, Henderson, Pretorius & Cerulo, of Springfield, and Mark Jonathan Stewart, of Washington, D.C., for *amicus curiae* North American Securities Administrators Association, Inc.

Justices

JUSTICE NEVILLE delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Thomas, Kilbride, Garman, Burke, and Theis concurred in the judgment and opinion.

## OPINION

¶ 1    The Illinois Secretary of State Securities Department (Department) initiated administrative proceedings against Richard Lee Van Dyke based on charges that he had engaged in fraudulent and misleading conduct in violation of the Illinois Securities Law of 1953 (Act) (815 ILCS 5/1 *et seq.* (West 2012)). Following a hearing, Secretary of State Jesse White (Secretary) issued a final administrative decision finding that Van Dyke had violated several sections of the Act. Based on that decision, the Secretary revoked Van Dyke's registration as an investment adviser, prohibited him from selling securities in Illinois, and ordered him to pay certain fines and costs. The circuit court of Sangamon County affirmed that decision, and Van Dyke appealed. The appellate court reversed, holding that the Department had failed to prove that Van Dyke violated the Act. 2016 IL App (4th) 141109. This court allowed the petition for leave to appeal filed by the Secretary, the Department, and its director, Tanya Solov. Ill. S. Ct. R. 315 (eff. Mar. 15, 2016). For the following reasons, we affirm the judgment of the appellate court.

## I. BACKGROUND

At all relevant times, Van Dyke was licensed by the Department of Insurance as an insurance producer. Insurance producers are licensed and regulated by the Department of Insurance under the Illinois Insurance Code (215 ILCS 5/1 *et seq.* (West 2012)). Van Dyke was also registered with the Illinois Secretary of State Securities Department as an investment adviser. Investment advisers are regulated by the Department under the Act (815 ILCS 5/1 *et seq.* (West 2012)).

In August 2011, two Department auditors, Herb Clausen and Ray DeWitt, appeared at Van Dyke's place of business to conduct an investment adviser audit. The auditors received instructions from the Department's senior enforcement attorney, David Finnigan, to conduct the audit after the agency received a complaint from the adult children of one of Van Dyke's deceased clients. The auditors first reviewed Van Dyke's investment adviser files and found nothing wrong. They then reviewed Van Dyke's insurance files.

In March 2013, the Department filed a notice of hearing to determine whether Van Dyke's registration as an investment adviser should be retroactively revoked or suspended and whether he should be prohibited from offering or selling securities in the state of Illinois. As grounds for the proposed action, the Department alleged that Van Dyke had "defrauded over 21 clients, all of whom are senior citizens, of $263,822.13."

The Department charged that Van Dyke obtained investment clients through seminars, his website, and advertisements and that he later provided investment advice, financial planning, and recommendations to purchase financial products, including indexed annuities.

In particular, the Department alleged that, from February 2009 through October 2010, Van Dyke effectuated 31 purchase transactions involving the liquidation of the clients' previously owned indexed annuities to purchase one or more new indexed annuities. The Department further alleged that, as a result of these transactions, Van Dyke received $160,937.05 in commissions.[1] In all but one transaction, the original indexed annuity had been sold to the clients by Van Dyke, and he earned $155,341.51 in commissions.[2] In total, Van Dyke earned $316,278.56 in commissions from the sale of these indexed annuities while his clients lost $263,822.13 in surrender charges, penalties, and other fees. The Department charged that all of the purchase transactions reviewed "involved persons age 58 or older at the time of the transactions, with the oldest person being 82."

The Department also alleged that Van Dyke violated section 130.853 of the Department's administrative regulations under the Act, which prohibits an investment adviser from effectuating any transactions of purchase or sale that are excessive in size or frequency or unsuitable and constitute a fraudulent, deceptive, or manipulative act. 14 Ill. Adm. Code 130.853 (1997).

Finally, the Department alleged that the indexed annuities are securities and that Van Dyke violated the Act by acting as an investment adviser and engaging in transactions, a practice, or a course of business that tended to work a fraud or deceit upon his clients. The Department

---

[1]Agents earn a commission from the issuing company for each contract sold. The commission is paid by the company and is not deducted from the premiums paid for the contract.

[2]One original contract was a fixed annuity used to purchase the replacement contract, which we include with the other surrendered contracts.

charged that Van Dyke violated sections 12(A), (F), (G), (I), and (J) of the Act (815 ILCS 5/12(A), (F), (G), (I), (J) (West 2012)).

¶ 10 Van Dyke moved to dismiss the charges against him, arguing that the Department had no jurisdiction because section 2.14 of the Act (*id.* § 2.14) excluded indexed annuities from the Act's definition of "security" and because he did not act as an investment adviser in the alleged transactions. The hearing officer denied Van Dyke's motion, finding the indexed annuities were subject to the Act's provisions and that the notice of hearing alleged sufficient facts to impose sanctions against Van Dyke as an investment adviser.

¶ 11 Also in March 2013, the Department of Insurance filed a separate administrative action seeking to discipline Van Dyke based on the same annuity transactions. Following investigation and amended charges by the Department of Insurance, Van Dyke settled the insurance action, with no admission of guilt, for $6000 to resolve allegations he failed to complete 4 annuity replacement forms and answered questions incorrectly on 22 suitability forms submitted to an insurance company.

¶ 12 Beginning in April 2013 and continuing through August 2013, a six-day administrative hearing ensued. Evidence presented at the hearing indicated that Van Dyke prepared financial plans for certain clients, in which he provided investment advice and recommendations for the purchase and sale of financial products including the original indexed annuity contracts (original contracts) and the replacement indexed annuity contracts (replacement contracts).

¶ 13 The Department's witnesses included DeWitt, the Department's auditor; Edward O'Neal, Ph.D., who was admitted as an expert in financial analysis; Department of Insurance actuary Susan Lamb; and four of Van Dyke's clients. The Department also presented 172 exhibits, including financial planning documents, duplicates of three different types of original contracts and a duplicate of a replacement contract, and documents used in the applications and surrenders of the contracts.

¶ 14 DeWitt, who has an associate's degree in accounting, testified that he prepared several spreadsheets to compare the aggregate dollar amounts of the original contracts to the replacement contracts. One of the spreadsheets, identified as exhibit 145, included columns comparing (1) the surrendered original contract totals plus their market value adjustments (MVAs) to the replacement contracts with bonuses, which calculated a total loss of $99,480.95 for all 21 clients and (2) the surrendered original contract totals plus MVAs to the replacement contracts without bonuses, which calculated a total loss of $297,457.06 for all 21 clients. In explaining exhibit 145, DeWitt testified that he was told by Finnigan to distinguish between the values of the replacement contracts with bonuses and without bonuses. DeWitt also testified that "the Department doesn't recognize a bonus as a reason for switching an annuity."

¶ 15 DeWitt further explained that the MVA is not a credit or offset against the surrender charges but, rather, is a device that the issuing company uses to pass its interest-rate risk to the purchaser by causing the annuity's cash surrender value to fluctuate based on any changes in the prevailing interest rates. If interest rates have risen since the purchase, the MVA is negative; the MVA is positive if interest rates have dropped during that time. DeWitt acknowledged that the MVA applies only if there is a surrender of the insurance annuity within the surrender charge period.

¶ 16 When questioned by Van Dyke's attorney regarding exhibit 145 and his decision to add the MVAs to the values of the original contracts, DeWitt conceded that a contract does not

have an MVA prior to surrender. DeWitt acknowledged that surrender charges applied to the value of the original contracts and that his calculations did not include any surrender charges. He admitted that this circumstance called into question the calculations referred to in exhibit 145 and that he did not take into consideration all of the applicable factors. Also, although DeWitt had read the "base contracts," he stated that he did not use the formula specified by the issuer to determine the relevant calculation for surrender of the annuities. DeWitt testified that his calculations represented by exhibit 145 showed a loss for every individual, but he admitted that those calculations were "faulty." Yet when later questioned by Finnigan as to the accuracy of exhibit 145, DeWitt stated his numbers were correct and reflected the figures at a "snapshot in time."

¶ 17        DeWitt testified that he had compared the annual fees and guaranteed minimum rates of return for the original contracts and replacement contracts. The replacement contracts imposed higher fees than the original contracts for all but one client. According to DeWitt, Van Dyke had made various misrepresentations in the replacement contract transactions, including suitability confirmation worksheets representing that 17 of the original contracts would impose no surrender penalties and that 6 other original contracts would impose lower surrender penalties than the actual amounts.[3] DeWitt further testified that he was looking at the transactions strictly from an economic dollar standpoint and did not take into consideration any of the features, such as bonus recapture, of the replacement contracts that were not included in the original contracts. He also acknowledged that he did not conduct any individualized analysis.

¶ 18        Susan Lamb, the Department of Insurance actuary, described the suitability factors applicable when recommending a replacement contract. She also testified that a financial adviser "needs to consider the individual's financial situation. Every individual's financial situation is unique, they have different needs, they have different expectations. They also need to very clearly consider the features in the current annuity contract versus the features in the potential replaced contract."

¶ 19        At Finnigan's request, O'Neal conducted a financial analysis of the replacement transactions. In preparing his analysis, O'Neal reviewed approximately 12 pages of documents that he received from Finnigan. These documents consisted of exhibit 143, a spreadsheet prepared by auditor DeWitt, showing surrender amounts, surrender charges, and MVA; exhibit 6, a spreadsheet listing surrendered original contracts, issued by ING, with corresponding adjustments; three pages of a replacement contract from Aviva explaining the MVA; and surrender charge schedules for the original contracts and replacement contracts for four of Van Dyke's clients. O'Neal testified that he did not check the accuracy of exhibit 143 but assumed that the numbers were correct. When asked if he considered the new features that were in the replacement contracts versus the original contracts, O'Neal testified that he had not looked at the bonus recapture provision, income roll-up provision, income rider, withdrawal without penalties provision, or the death benefit rider in the replacement contracts.

¶ 20        O'Neal prepared a 33-page PowerPoint presentation to explain his analysis. He analyzed the transactions by comparing the predicted cash values of the original contracts and replacement contracts by projecting their future annual values over the course of 25 years. For

---

[3]These were the same contract forms that were at issue in the Department of Insurance proceedings.

the sake of analysis, he presented a slide titled "Assumptions," which included a 3% guaranteed contract interest rate and identical annual fees for both the original contracts and the replacement contracts. He did not include the bonus in the replacement contract, as he determined that it was not a financial advantage for the client. He explained that the actual interest rate would change the particular quantitative results but would "not make a difference qualitatively to the findings." He adjusted the cash flow values for the "time-value of money" and life expectancy of the purchaser to determine the present cash value of each contract. Based on his analysis, O'Neal determined that the present day cash values of the original contracts, at the time of the replacement transactions, were always higher than the replacement contracts' present day cash value.

¶ 21    O'Neal also analyzed four sample individualized transactions and determined that for two of the four, the original contracts had a higher cash value than the replacement contracts. For the other two sample transactions, the original contract had a higher cash value for the first 10 years. He opined that none of the sample individualized transactions or any of the other challenged transactions were in the best interests of the clients.

¶ 22    The Department presented four of Van Dyke's clients, who were subpoenaed and testified at the hearing. Three of Van Dyke's clients testified that they could not remember if Van Dyke discussed the surrender fee and MVA. However, all of his clients testified that they were pleased with the replacement contracts, and none had any complaints or concerns with Van Dyke.

¶ 23    Van Dyke presented Bruce Sartain, another Department of Insurance actuary, who stated that, absent surrender, an MVA does not increase the value of the annuity nor does it earn interest or have value. He further testified that a positive MVA increases the net surrender value, and it is one of several factors the Department of Insurance considers relevant for any annuitant contemplating "when or if to surrender an annuity."

¶ 24    Several of Van Dyke's clients testified on his behalf. Marilyn Klee testified that Van Dyke had explained everything thoroughly. She and her husband consulted Van Dyke, who discussed a number of benefits that were not available in the original contract, including various rider options. George Perry testified that he understood that an annuity is insurance and not a security and he was aware that he would incur surrender penalties. He also testified that the replacement contract had a bonus feature that immediately increased the accumulated value to allow more growth from day one, something he "definitely" considered beneficial. The Sawyers testified that at no time did they feel that Van Dyke had taken advantage of them and they were more than satisfied with the results because the replacement contracts served their interests better than the original contracts.

¶ 25    Several other clients gave similar testimony, stating that they were aware of surrender charges but felt the replacement contract provided more benefits than the original contract. A few clients could not remember whether Van Dyke went over the charges but thought it could have happened. They were all happy with Van Dyke and had no concerns or complaints.

¶ 26    In March 2014, the hearing officer issued his report and recommendation, including his findings of fact and conclusions of law, as well as his recommended sanctions. In April 2014, the Secretary issued a final order adopting virtually all of the hearing officer's findings of fact and conclusions of law. In particular, he found that the documents disclosed that "from February 2009 through October 2010, Van Dyke effected 33 indexed annuity purchase

transactions involving the liquidation of 30 previously owned indexed annuity contracts by 21 of his clients, resulting in surrendered annuity contract commissions of $183,161.58, and $177,417.42 in new annuity contract commissions." The Secretary also found that the contract values for the 30 surrendered indexed annuities totaled $2,327,904.95 but that the final amount credited to the 21 clients only totaled $2,246,897.59. He further found that 11 of the 30 surrendered annuities resulted in eight clients having taxable income reported.

¶ 27 The Secretary determined that "all of the 33 new Indexed Annuity purchase transactions reviewed by the Department involved persons from 61 to 82 years of age." The Secretary also determined that all but one of the 33 replacement contracts featured higher fees and the start of new surrender penalty periods. The Secretary found that all 33 transactions were solicited and made at Van Dyke's recommendation or as part of investment advice or financial planning provided by Van Dyke.

¶ 28 Considering the statutory definitions of the terms "security," "sale," and "offer," the Secretary found that the subject indexed annuities were securities under the Act and that, although an indexed annuity is exempt from registration with the Department, the offer or sale of an indexed annuity is still subject to the other provisions of the Act. The Secretary further determined that section 130.853 of the Department's administrative regulations under the Act (14 Ill. Adm. Code 130.853 (1997)) was applicable and that, as a registered investment adviser, Van Dyke was held to a fiduciary standard who must act in the best interests of his clients. The Secretary also found that the subject indexed annuity transactions were both unsuitable and not in the best interests of the clients, due to the age of the clients, the surrender penalties incurred due to the early liquidation of the existing indexed annuity contracts, the frequency of the commissions paid, and no derivation of additional tax benefits.

¶ 29 The Secretary determined that Van Dyke engaged in a transaction, practice, or course of business in connection with the sale of at least 33 indexed annuity contracts that worked or tended to work a fraud or deceit upon the purchasers by representing to and misleading his clients who liquidated an existing annuity contract to purchase a new annuity contract that (1) the surrender penalty charges incurred would be recovered by a positive market value adjustment; (2) the new annuity provided favorable bonuses and interest; (3) the new annuity was a better investment over the current annuity and in the client's best interests; (4) the new annuity would not be a replacement annuity; (5) funds to purchase the new annuity did not come from an existing annuity; and (6) there were not any settlement fees, surrender charges, or penalties of any kind.

¶ 30 The Secretary concluded that Van Dyke violated sections 12(A), (F), (G), (I), and (J) of the Act. As a consequence, the Secretary revoked Van Dyke's investment adviser registration, permanently prohibited him from offering or selling securities in Illinois, fined him $330,000 ($10,000 for each replacement annuity), and ordered him to pay $23,500 as costs of the investigation and the expert witness.

¶ 31 Van Dyke filed a complaint for administrative review. Therein, Van Dyke argued the Secretary's decision was entered without jurisdiction and was "contrary to the preponderance of the evidence." The circuit court affirmed the Secretary's final administrative order, and Van Dyke appealed.

¶ 32 On appeal, Van Dyke argued that the Department and Secretary had no jurisdiction over the marketing and sale of indexed annuities by insurance producers and insurance companies

authorized to transact business in Illinois. Van Dyke contended that an indexed annuity is not a security under section 2.14 of the Act (815 ILCS 5/2.14) (West 2012)) and that it falls under the authority of the Department of Insurance to regulate annuity policies.

¶ 33    The appellate court agreed, reasoning:

"Under section 2.1 of the Act (815 ILCS 5/2.1 (West 2012)), the term 'security' is defined to include a 'face-amount certificate.' Section 2.14 of the Act (815 ILCS 5/2.14 (West 2012)) defines 'face amount certificate' to include 'any form of annuity contract (other than an annuity contract issued by a life insurance company authorized to transact business in this State).' Here, the indexed annuities in question are annuities issued by insurance companies authorized to transact business in Illinois. Thus, they are not securities under Illinois law. To hold otherwise would go against the plain language of the Act." 2016 IL App (4th) 141109, ¶ 24.

¶ 34    The court noted that its conclusion was further supported by the fact that the General Assembly declared variable annuities, which do not provide minimum guarantees and are the type of annuities most susceptible to being classified as securities, fall under the sole jurisdiction of the Department of Insurance. See 215 ILCS 5/245.24 (West 2012). The court also explained that it would make little sense for the legislature to place variable annuities out of the reach of the Securities Department but then subject annuity products such as indexed annuities to securities regulation. 2016 IL App (4th) 141109, ¶ 25. The court noted that the Department's ruling that indexed annuities are securities lacked any reasoned explanation in its administrative order. *Id.* ¶ 26.

¶ 35    The court further held that Van Dyke acted both as a registered investment adviser under the Act and as a licensed insurance producer under the Insurance Code. *Id.* ¶ 30. Accordingly, he was subject to the legal duties under each regulatory regime, including the Act's antifraud provisions. *Id.*

¶ 36    In addressing the Secretary's finding that Van Dyke had violated section 12(J) of the Act, the court determined that the Secretary's decision was arbitrary, capricious, and against the manifest weight of the evidence. The court observed that the Secretary failed to set forth any applicable rules or written criteria to evaluate insurance annuities that would indicate its expertise in that area, whereas the Department of Insurance has enacted detailed regulations addressing suitability factors that insurance producers and insurance companies must adhere to when offering or selling annuities, including replacement annuities, to Illinois consumers.

¶ 37    The court explained that, in his final order, the Secretary did not identify any regulation other than section 130.853 of the Illinois Administrative Code (14 Ill. Adm. Code 130.853 (1997)), which refers to unsuitable transactions effectuated by a registered agent for a client's account. The court explained that section 130.853 has nothing to do with an insurance producer selling an annuity to an insurance client. 2016 IL App (4th) 141109, ¶ 37.

¶ 38    The court concluded that the evidence presented by the Department also failed to show Van Dyke fraudulently induced 21 clients to purchase replacement contracts. *Id.* ¶ 39. The court reasoned that, here, there was no consideration as to whether the replacement contracts were suitable based on each individual client's unique needs and financial status. The court also determined that the Secretary's witnesses were not asked to perform the individualized suitability comparison described by the insurance expert Lamb. *Id.* ¶ 40. The court further noted that of the 14 Van Dyke clients who testified, none of them had any complaints. *Id.* ¶ 41.

¶ 39   The court found that the evidence presented failed to establish Van Dyke violated the Act in the sale of the replacement contracts or that he perpetrated a fraud on his clients. The court reversed the Secretary's final order revoking Van Dyke's investment adviser registration, prohibiting him from offering or selling securities in Illinois, fining him $330,000, and requiring him to pay witness fees of $23,500. *Id.* ¶ 42.

¶ 40   The Secretary appeals to this court, and Van Dyke seeks cross-relief. We also allowed the Public Investors Arbitration Bar Association *et al.* to file briefs as *amici curiae* in support of the Secretary's position. We further allowed the Fidelity & Guaranty Life Insurance Company *et al.* to file briefs as *amici curiae* in support of Van Dyke's position. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010). Additional pertinent facts will be discussed in the context of the issues raised on appeal.

¶ 41                                         II. ANALYSIS

¶ 42   Before this court, the Secretary contends that the appellate court erred in holding that the indexed annuities at issue are not "securities" as that term is defined by the Act. In the alternative, the Secretary contends that, even if the indexed annuities do not qualify as securities, he had authority to bring the administrative action against Van Dyke under section 12(J) of the Act, which does not require that a security be involved in the fraudulent transaction. The Secretary also asserts that the appellate court erroneously concluded that the evidence presented at the administrative hearing was insufficient to establish that Van Dyke violated section 12 of the Act by engaging in fraudulent, deceptive, or manipulative conduct in recommending the purchase of the indexed annuities at issue.

¶ 43   Van Dyke responds by contending that the indexed annuities are not "securities" under the Act and, therefore, the Department lacked authority to bring the administrative action against him.[4] Van Dyke further contends that the appellate court properly reversed the Secretary's administrative decision because the Department acted arbitrarily in bringing the enforcement action against him and failed to prove fraud with respect to the subject transactions. In addition, Van Dyke argues that section 12(J) of the Act does not apply because he was not acting as an investment adviser when he recommended that his clients purchase the subject indexed annuities. Van Dyke also seeks cross-relief, asserting that the fines and penalties imposed against him were arbitrary and excessive and that he is entitled to recover his attorney fees based on the invalidation of the administrative rule announced in the Secretary's decision.

¶ 44                             A. The Statutory Definition of Securities

¶ 45   We initially address the Secretary's argument that the appellate court erred in holding that the indexed annuities at issue are not securities under the Act. On administrative review, this court reviews the decision of the Secretary. *Board of Education of the City of Chicago v. Illinois Educational Labor Relations Board*, 2015 IL 118043, ¶ 14. The determination of

_____

[4]Van Dyke asserts that the Department had "no jurisdiction" over annuities issued by an authorized insurance company. The term "jurisdiction" is not strictly applicable to an administrative agency, but it has been used to refer to the authority of the administrative agency to act. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 243 (1989) (citing *Newkirk v. Bigard*, 109 Ill. 2d 28, 36 (1985)). Accordingly, we consider Van Dyke's contention as challenging the Department's authority to bring the enforcement action against him.

whether a financial instrument falls within the definition of a "security" under the Act is a matter of statutory construction, which presents a question of law subject to *de novo* review. *People ex rel. Madigan v. Wildermuth*, 2017 IL 120763, ¶ 11.

¶ 46     When interpreting a statute, the court's primary objective is to ascertain and give effect to the intent of the legislature. *Id.* ¶ 17. The most reliable indicator of legislative intent is the language of the statute itself, which must be given its plain and ordinary meaning. *Id.* We consider the statute in its entirety, keeping in mind the subject it addresses and the apparent intent of the legislature in enacting it. *Id.* Words and phrases should not be construed in isolation but must be interpreted in light of other relevant provisions of the statute. *Id.* No part of a statute should be rendered meaningless or superfluous. *Skaperdas v. Country Casualty Insurance Co.*, 2015 IL 117021, ¶ 15. Clear and unambiguous language will be applied as written. *In re Estate of Shelton*, 2017 IL 121199, ¶ 36. In addition, specific statutory provisions will control over general provisions on the same subject. *People ex rel. Madigan v. Burge*, 2014 IL 115635, ¶ 31. Courts must construe statutes relating to the same subject matter with reference to one another so as to give effect to the provisions of each, if reasonable. *Harris v. Thompson*, 2012 IL 112525, ¶ 25. Moreover, courts will presume that the legislature did not intend to enact a statute that leads to absurdity, inconvenience, or injustice. *Lutkauskas v. Ricker*, 2015 IL 117090, ¶ 36.

¶ 47     The purpose of the Act is to protect innocent persons who may be induced to invest in speculative enterprises over which they have little control. *Carpenter v. Exelon Enterprises Co.*, 399 Ill. App. 3d 330, 334 (2010). To effectuate the Act's paternalistic goals, it should be given a liberal construction, and courts construe the term "security" broadly. *Id.*; *Polikoff v. Levy*, 55 Ill. App. 2d 229, 234 (1965).

¶ 48     In determining whether the indexed annuities at issue in this case are securities, we necessarily begin with an examination of the language of the statute itself. Section 2.1 of the Act sets forth the definition of a "security" and provides in relevant part as follows:

> " 'Security' means any note, stock, treasury stock, *** investment contract, *** face-amount certificate, *** or, in general, any interest or instrument commonly known as a 'security' ***." 815 ILCS 5/2.1 (West 2012).

¶ 49     Section 2.14 defines the term "face amount certificate" to include "any form of annuity contract (other than an annuity contract issued by a life insurance company authorized to transact business in this State)." *Id.* § 2.14. According to the clear and unambiguous language of this provision, the type of financial instrument designated as a "face amount certificate" specifically excludes all annuity contracts issued by an authorized life insurance company. *Id.* Considered together, sections 2.1 and 2.14 plainly demonstrate that any form of annuity contract issued by an authorized insurer is not included within the classification of "face-amount certificate" set forth in section 2.1's definition of a "security." The indexed annuities at issue in this case were issued by authorized life insurance companies and are similarly excluded from the statutory definition of a "security."

¶ 50     The Secretary does not dispute this point but argues that the appellate court erred in failing to consider whether the indexed annuities are securities because they constitute "investment contracts." The Secretary points out that, because the definition of a "security" in section 2.1 lists a wide array of financial instruments and interests, separated by the disjunctive "or," each phrase constitutes an independent ground for determining that a transaction involves a security.

- 10 -

See *Integrated Research Services, Inc. v. Secretary of State*, 328 Ill. App. 3d 67, 71 (2002). The Secretary contends that the indexed annuities are "investment contracts" as that term has been interpreted by federal courts construing the federal Securities Act of 1933 (the federal statute), which exempts from securities regulation any annuity contract issued by a company that is subject to state insurance regulation. 15 U.S.C. §§ 77b(1), 77c(a)(8) (2012). According to the Secretary, our Act must be construed similarly because it was patterned after the federal statute and because Illinois courts have adopted the United States Supreme Court's construction of the term "investment contract" in applying the Act. See *Daleiden v. Wiggins Oil Co.*, 118 Ill. 2d 528, 537-40 (1987) (citing Samuel H. Young, *Exemptions From Registration Under the Illinois Securities Law of 1953*, 1961 U. Ill. L.F. 205, 206); see also *Ronnett v. American Breeding Herds, Inc.*, 124 Ill. App. 3d 842, 847 (1984).

¶ 51 As interpreted by the Supreme Court, the term "investment contract" " 'means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.' " *Daleiden*, 118 Ill. 2d at 538 (quoting *Securities & Exchange Comm'n v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946)). In the Secretary's view, the indexed annuities at issue in this case are such contracts. In support, the Secretary relies primarily on *Securities & Exchange Comm'n v. Variable Annuity Life Insurance Co. of America*, 359 U.S. 65 (1959) (*VALIC*), *Securities & Exchange Comm'n v. United Benefit Life Insurance Co.*, 387 U.S. 202 (1967) (*United Benefit*), and *American Equity Investment Life Insurance Co. v. Securities & Exchange Comm'n*, 613 F.3d 166 (D.C. Cir. 2010) (*American Equity*).

¶ 52 In *VALIC*, the Supreme Court considered whether variable annuity contracts constituted securities under the federal statute. *VALIC*, 359 U.S. at 69. In doing so, the Court emphasized the various characteristics that distinguish a variable annuity from a traditional annuity, noting that a traditional annuity provides the purchaser with specified amounts that are paid at definite times and that the funds underlying such annuities are invested in conservative instruments. *Id.* In contrast, purchasers of variable annuities pay premiums that are invested in common stocks, and the benefit payments vary with the success of the investment policy. *Id.* The Court explained that, without a guarantee of fixed income, all of the investment risk is borne by the purchaser. *Id.* at 71. The Court observed that the issuer of a variable annuity guarantees the purchaser only an interest in a portfolio of common stocks or other equities, which is "an interest that has a ceiling but no floor." *Id.* at 72. The Court reasoned that, because the variable annuity did not require the issuer to assume any "true underwriting of risks," it did not fall within the exemption in section 3(a)(8) of the federal statute (15 U.S.C. § 77c(a)(8) (1952)) for traditional annuities issued by insurers. *VALIC*, 359 U.S. at 73.

¶ 53 In *United Benefit*, the Court elaborated on the *VALIC* decision by addressing whether the variable component of a deferred, or optional, annuity contract (the "Flexible Fund") was a security under the federal statute. *United Benefit*, 387 U.S. at 207, 209. The Court observed that the Flexible Fund was similar to a variable annuity in that the purchaser paid premiums into a separate account that was primarily invested in common stocks, with the goal of producing capital gains and an interest return. *Id.* at 204-05. In determining whether the Flexible Fund constituted a security, the Court considered whether it " 'involve[d] considerations of investment not present in the conventional contract of insurance.' " *Id.* at 210 (quoting *Prudential Insurance Co. of America v. Securities & Exchange Comm'n*, 326 F.2d 383, 388 (3d Cir. 1964)). The Court noted that the Flexible Fund's appeal to the purchaser was

- 11 -

"the prospect of 'growth' through sound investment management." *Id.* at 211. Although the purchaser's investment risk was substantially reduced by a guarantee that a percentage of the premiums would be returned, that circumstance was insufficient to create an insurance obligation under the federal statute. *Id.* The Court particularly considered the " 'character the instrument is given [by the promoter], the plan of distribution, and the economic inducements held out to the prospect.' " *Id.* (quoting *Securities & Exchange Comm'n v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-53 (1943)). Given that the Flexible Fund was marketed to consumers interested in "growth through professionally managed investment," the Court concluded that it did not fall within the insurance exemption in section 3(a)(8) of the federal statute. *Id.* at 211-12.

¶ 54    The Secretary also relies on *American Equity*, in which the United States Court of Appeals for the District of Columbia Circuit addressed the validity of a Securities and Exchange Commission (SEC) regulation providing that certain indexed annuities are securities and do not fall within the insurance exemption in the federal statute. *American Equity*, 613 F.3d at 167, 170-71. In determining whether the SEC's administrative rule was valid, the court of appeals initially found that the insurance exemption in section 3(a)(8) was ambiguous, or at least silent, as to whether the term "annuity contract" encompasses all forms of contracts that may be described as annuities, including the indexed annuity at issue. *Id.* at 172-73. The court then considered whether the SEC's interpretation of the federal statute to include fixed index annuities as securities was reasonable. *Id.* at 173. The court characterized the fixed index annuity as "a hybrid financial product that combines some of the benefits of fixed annuities with the added earning potential of a security." *Id.* at 168. Relying on the reasoning in *VALIC* and *United Benefit*, the court determined that the SEC's interpretation was reasonable. *Id.* at 174-75. The court noted that fixed index annuities " 'appeal to the purchaser not on the usual insurance basis of stability and security but on the prospect of 'growth' through sound investment management.' " *Id.* at 174 (quoting *United Benefit*, 387 U.S. at 211). The court explained that a fixed index annuity is similar to a security because variability in the potential return " 'involve[s] considerations of investment not present in the conventional contract of insurance.' " *Id.* (quoting *United Benefit*, 387 U.S. at 210). The court observed that the wide range of potential return based on the performance of a securities index makes fixed index annuities "more like securities from a risk perspective than other annuity contracts." *Id.* at 176. In light of these considerations, the court concluded that the SEC had reasonably interpreted the federal statute to include fixed index annuities as instruments that are subject to federal securities regulation. *Id.*

¶ 55    We find, however, that *VALIC*, *United Benefit*, and *American Equity* do not control here because our statutory regime, though similar to the federal regime, is fundamentally different in several key respects.[5] First and foremost, section 2.1 of the Act includes "face-amount

---

    [5]The federal law applicable to indexed annuities has changed since *VALIC*, *United Benefit*, and *American Equity* were decided. Pursuant to an amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act, a fixed index annuity falls within the insurance exemption in section 3(a)(8) where (1) the value does not vary according to the performance of a separate account; (2) it satisfies nonforfeiture laws; and (3) it is issued on or after June 16, 2013, in a state, or issued by an insurance company that is domiciled in a state, that adopts suitability requirements that meet the Suitability in Annuity Transactions Model Regulation. Dodd-Frank Wall Street Reform and Consumer

- 12 -

certificate" in the definition of a "security" (815 ILCS 5/2.1 (West 2012)), whereas no such reference is included in the definition contained in the federal securities statute (15 U.S.C. § 77b(1) (2012)).[6] This difference is significant because our legislature has clearly and deliberately excluded from the definition of "face amount certificate" any annuity contract issued by an authorized life insurance company. Thus, while the federal statute includes an insurance *exemption* in section 3(a)(8) (15 U.S.C. § 77c(a)(8) (2012)), our Act declares that annuities issued by insurance companies are entirely *excluded*—not merely exempt—from the definition of a "security" (815 ILCS 5/2.14 (West 2012)). Also, because the term "face amount certificate" references a distinct and recognized type of financial instrument, it must be distinguished from the term "investment contract," which is a general descriptive designation that serves to encompass all types of "[n]ovel, uncommon, or irregular devices." *C.M. Joiner Leasing Corp.*, 320 U.S. at 351; see also *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Insurance Co.*, 698 F.2d 320, 324 (7th Cir. 1983) (describing the term "investment contract" as "a catch-all" phrase to include "interests that have the functional attributes of stock and other formal securities but are not so denominated"). Reliance on the "catch-all" phrase "investment contract" is unnecessary and inappropriate here, given that our statutory definition of "security" includes a reference to a particular type of financial instrument that encompasses annuities issued by insurance companies. As a consequence, the specific statutory provision excluding insurance annuities from the definition of "face amount certificate" in section 2.14 takes precedence over the generally descriptive term "investment contract" in section 2.1. See *Burge*, 2014 IL 115635, ¶ 31 (observing that specific statutory provisions will control over general provisions on the same subject). Although the term "security" is generally given a broad interpretation, that guideline does not allow us to ignore the clear and unambiguous language in section 2.14. Reading section 2.1 as the Secretary suggests effectively would nullify the insurance exclusion in section 2.14 and render that language superfluous. This we will not do. See *Skaperdas*, 2015 IL 117021, ¶ 15 (holding that no part of a statute should be rendered meaningless or superfluous).

¶ 56     Second, section 3(M) of the Act provides that the registration requirements in the Act do not apply to "[a]ny security issued by and representing an interest in or a debt of, or guaranteed by, an insurance company organized under the laws of any state." 815 ILCS 5/3(M) (West 2012). The Secretary asserts that this provision means that indexed annuities are securities under section 2.1 but are merely exempt from the registration requirements. We agree that indexed annuities need not be registered under the Act. But that does not mean that they fall within the definition of a "security" under section 2.1. If the legislature only intended to excuse

---

Protection Act, Pub. L. No. 111-203, § 989 J, 124 Stat. 1376, 1949-50 (2010); see Nat'l Ass'n of Ins. Commissioners, *Suitability in Annuity Transactions Model Regulation* (2015), https://www.naic.org/store/free/MDL-275.pdf [https://perma.cc/V7LZ-F2W4]. Therefore, an indexed annuity that satisfies the conditions set forth above qualifies for exemption under the federal statute. This amendment has no bearing here because the indexed annuities at issue were purchased in 2009 and 2010, long before the date specified in the amendment.

[6] Although section 80a-2(a)(15) of the federal Investment Company Act of 1940 provides a definition of the term "face-amount certificate," that definition does not specifically exclude annuity contracts issued by an insurance company. 15 U.S.C. § 80a-2(a)(15) (2012).

- 13 -

the registration obligation, it conclusively achieved that end with the exemption in section 3(M), and the specific exclusion in section 2.14 would be wholly unnecessary.

¶ 57　　In addition, we cannot ignore section 245.24 of the Illinois Insurance Code, which provides:

> "Notwithstanding any other provision of law, the Director [of Insurance] has *sole authority* to regulate the issuance *and sale* of variable contracts, and to promulgate such reasonable rules and regulations as may be appropriate to carry out the purposes and provisions of this Article." (Emphases added.) 215 ILCS 5/245.24 (West 2012).

There is no corollary provision in the federal statutes because regulation of the insurance industry generally falls under the control of the states. See *VALIC*, 359 U.S. at 68-69.

¶ 58　　The Secretary argues that section 245.24 has no relevance here because it applies only to variable annuities and because it merely grants the Director of Insurance exclusive authority to regulate the companies that issue variable contracts as well as the registration and form of such contracts and the maintenance of their separate accounts. According to the Secretary, this provision does not apply to the sale of variable annuities to individual buyers.

¶ 59　　We agree that the terms of section 245.24 apply only to variable annuities, but we disagree that application of that section should be restricted in the way the Secretary suggests. Under the plain language of that provision, regulation of "the issuance *and sale* of variable contracts" is vested in the Director of Insurance. (Emphasis added.) 215 ILCS 5/245.24 (West 2012). Section 245.24 contains no language that excludes sales to individual buyers, and we will not read into that provision an exception or limitation not expressed by the legislature. See *In re Estate of Shelton*, 2017 IL 121199, ¶ 36. The fact that its neighboring provisions pertain to the issuing companies and requirements of the contracts and separate accounts does not mandate that we do so.

¶ 60　　Contrary to the Secretary's argument, section 245.24 cannot be dismissed as wholly irrelevant to the question of whether an indexed annuity is a security under the Act. In addition to defeating the purpose of the insurance exclusion in section 2.14 of the Act, acceptance of the Secretary's argument would be inconsistent with section 245.24 of the Insurance Code. See *Harris*, 2012 IL 112525, ¶ 25 (recognizing that courts must construe statutes relating to the same subject with reference to one another so as to give effect to the provisions of each, if reasonable).

¶ 61　　By enacting section 245.24, the legislature deliberately assigned regulatory control over the sale of variable annuities, which place all of the investment risk on the purchaser, to the Department of Insurance. This critical difference further distinguishes our overall statutory regime from the federal regime.

¶ 62　　Moreover, we observe that the underlying premise of the Secretary's argument is that the *variable* rate of return—not the guaranteed minimum rate—qualifies the indexed annuities as securities. Given that the Department of Insurance regulates both traditional and variable annuities as insurance products, it would be incongruous for indexed annuities—a hybrid of the two—to be subject to regulation as a security under the Act. See *Lutkauskas*, 2015 IL 117090, ¶ 36 (recognizing that courts will presume that the legislature did not intend to enact a statute that leads to absurdity, inconvenience, or injustice).

¶ 63　　Lastly, the Secretary concedes that the Department of Insurance regulates both variable and indexed annuities. He claims, however, that insurance producers may be subject to

"overlapping" regulation because the Department of Insurance regulation that governs licensure of variable contract producers requires them to report any discipline imposed by state securities agencies or judgments under securities law. See 50 Ill. Adm. Code 1551.90(d) (2001). But the imposition of this reporting requirement makes sense, given that an insurance producer may also be licensed as an investment adviser and, thereby, subject to regulation under the Act. The fact that investment advisers are required to inform the Department of Insurance about prior securities violations does not mean that an indexed annuity falls within the definition of a "security" under section 2.1 of the Act.

¶ 64　　　Considered in its entirety, our statutory regime demonstrates the legislature's intent that annuity contracts issued by authorized insurers are insurance products and are not securities because they fall within the exclusion from face amount certificates and are not investment contracts under section 2.1. As a consequence, Van Dyke's recommendation that his clients purchase the indexed annuities at issue in this case cannot form the basis of a violation of sections 12(A), (F), (G), or (I) of the Act.

¶ 65　　　　　　　　　B. The Secretary's Decision Under Section 12(J)

¶ 66　　　The Secretary contends that, even if the indexed annuities do not qualify as securities, he had authority to bring the administrative action against Van Dyke under section 12(J) of the Act. The Secretary also asserts that the appellate court erroneously concluded that the evidence presented at the administrative hearing was insufficient to establish that Van Dyke violated section 12 of the Act by engaging in fraudulent, deceptive, or manipulative conduct in recommending the purchase of the indexed annuities at issue.

¶ 67　　　Van Dyke responds that the appellate court properly reversed the Secretary's administrative decision because the Department acted arbitrarily in bringing the enforcement action against him and failed to prove fraud with respect to the subject transactions. Van Dyke argues that section 12(J) of the Act does not apply because he was not acting as an investment adviser when he recommended that his clients purchase the subject indexed annuities.

¶ 68　　　An administrative agency's findings and conclusions on questions of fact are deemed *prima facie* true and correct. In examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or substitute its judgment for that of the agency. Instead, a reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence. An administrative agency's factual determinations are against the manifest weight of the evidence if the opposite conclusion is clearly evident. In contrast, an agency's decision on a question of law is not binding on a reviewing court. An agency's interpretation of statutory language presents a pure question of law, which this court reviews *de novo*. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). Also, whether an investment adviser owes a fiduciary duty to his clients under the Act presents a question of law that is reviewed *de novo*. See *Gouge v. Central Illinois Public Service Co.*, 144 Ill. 2d 535, 542 (1991) (recognizing that ascertaining the existence of a duty is question of law).

¶ 69　　　Section 12(J) of the Act provides that it is a violation for a person

　　　　"[w]hen acting as an investment adviser, investment adviser representative, or federal covered investment adviser, by any means or instrumentality, directly or indirectly:

- 15 -

(1) To employ any device, scheme or artifice to defraud any client or prospective client;

(2) To engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; or

(3) To engage in any act, practice, or course of business which is fraudulent deceptive or manipulative." 815 ILCS 5/12(J) (West 2012).

¶ 70    Section 12(J) contains no reference to or requirement for a sale of a security in connection with the proscribed conduct. The plain language broadly prohibits any scheme to defraud by any means or instrumentality, directly or indirectly. As opposed to the statutory definitions discussed above in section II.A. of this opinion, the substantive terms of section 12(J) are virtually identical to the antifraud provisions in section 206 of the federal Investment Advisers Act of 1940 (Advisers Act) (15 U.S.C. § 80b-6 (2012)). Given that similarity, it is appropriate to consider the language of section 206 and federal cases interpreting it. Section 206 provides in relevant part that

"[i]t shall be unlawful for any investment adviser ***

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;
***

(4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." *Id.*

Federal courts have clarified that section 206 does not require that the challenged transaction involve a security to prove a violation. See *Securities & Exchange Comm'n v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1308 (S.D. Fla. 2007); *Abrahamson v. Fleschner*, 568 F.2d 862, 877 (2d Cir. 1977).

¶ 71    The plain language of section 12(J) requires proof that Van Dyke was "acting as an investment adviser," an inquiry that can only be considered in the context of the definition of an "investment adviser" set forth in section 2.11 of the Act. See 815 ILCS 5/2.11 (West 2012). Section 2.11 provides in pertinent part as follows:

" 'Investment adviser' means any person who, for compensation, engages *** in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities or who, *** for direct or indirect compensation and as part of a regular advisory business, issues or promulgates analyses or reports concerning securities or any financial planner or other person who, as an integral component of other financially related services, provides the foregoing investment advisory services to others for compensation and as part of a business or *who holds himself or herself out* as providing the foregoing investment advisory services to others for compensation ***." (Emphasis added.) *Id.*

¶ 72    Under the clear and unambiguous language of section 2.11, the definition of an "investment adviser" expressly includes any person who holds himself or herself out as providing investment advisory services regarding securities. Thus, even if a particular transaction does

not involve a security, a person can fall within the purview of section 12(J) by holding himself or herself out as providing such investment advice. *Id.*

¶ 73    Here, the Secretary's determination that Van Dyke acted as an investment adviser in the replacement transactions is not against the manifest weight of the evidence. The record demonstrates that, as part of his business, Van Dyke provided investment advice as a component of his financial, retirement, and estate planning services. Those services involved recommendations regarding the purchase of various financial products, including securities and indexed annuities, and Van Dyke admitted that he acted as an investment adviser for his clients with regard to the original contracts. In addition, the documents in the record indicate that Van Dyke identified himself as an investment adviser when communicating with his clients about the replacement contracts and in corresponding on their behalf with the companies issuing the replacement contracts. Also, there is no indication in the record that he severed his relationship as an investment adviser with any of those clients or otherwise informed them that he was only acting as an insurance producer with regard to the replacement contracts. Therefore, Van Dyke acted both as a registered investment adviser under the Act and as a licensed insurance producer under the Insurance Code and was subject to the legal duties under each regulatory regime, including the Act's antifraud provisions. Accordingly, Van Dyke was acting as an investment adviser, and his conduct brings him within the purview of section 12(J).

¶ 74    In the Advisers Act, Congress recognized that investment advisers have a fiduciary relationship with their clients. See *Securities & Exchange Comm'n v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191, 194 (1963). Consequently, investment advisers owe their clients a fiduciary duty that is a more exacting and higher standard than the suitability standard relied upon by the appellate court. Because the fiduciary duty standard is also a creature of common law, it is not determinative or significant that the Department did not have regulations or rules that specifically defined the nature of that duty or the particular obligations owed by an investment adviser. See *Danigeles v. Illinois Department of Financial & Professional Regulation*, 2015 IL App (1st) 142622, ¶ 78 (recognizing that administrative agencies may establish standards of conduct for applying statutes through individualized administrative adjudications).

¶ 75    A fiduciary relationship may arise as a matter of fact where one party reposes trust and confidence in another, who thereby gains a resulting influence and superiority over the subservient party. *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 58, (citing *Ray v. Winter*, 67 Ill. 2d 296, 304, (1977)). A fiduciary relationship may also arise as a matter of law, such as between a securities broker and his customer. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 592 (2011).

¶ 76    The investment adviser's fiduciary duty includes the obligation to act in his client's best interests and to disclose all material facts concerning a recommended investment. See *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 500 (1997). Coextensive with this duty is section 12(J)'s broad proscription against any act, practice, or course of conduct of business that is deceptive or manipulative, which reflects the legislature's recognition of the trust and confidence underlying the investment adviser's relationship with his client. 815 ILCS 5/12(J) (West 2012); 14 Ill. Adm. Code 130.852 (2012) (requiring investment advisers charge fair compensation and provide adequate disclosures); Ill. Adm. Code 130.853 (1997) (requiring investment

advisers to not engage in transactions unsuitable for their clients). Here, Van Dyke's clients testified that they had put their trust in him and relied on him for his investment advice. Accordingly, we find that Van Dyke owed a fiduciary duty under section 12(J) to act in the best interests of his clients when recommending the replacement contracts.

¶ 77    Next, we must determine whether the Secretary's finding that Van Dyke breached his fiduciary duty and committed fraud upon his clients is against the manifest weight of the evidence. The Secretary argues his findings, that Van Dyke violated section 12(J) by recommending replacement contracts that were not in his clients' best interests and engaged in fraudulent and manipulative conduct, are supported by the record. Van Dyke responds that the appellate court's conclusion that those findings were arbitrary, capricious, and against the manifest weight of the evidence is supported by the record. Van Dyke also contends that there is no competent evidence in the record that he defrauded any of his clients.

¶ 78    In examining an administrative agency's factual findings, a reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence. *Cinkus*, 228 Ill. 2d at 210.

¶ 79    The Secretary argues that the record shows that, as a result of the replacement transactions, each client incurred surrender charges and losses totaling almost $300,000, while Van Dyke was paid over $175,000 in commissions. In addition, DeWitt testified that the replacement contracts imposed higher annual fees than the original contracts, which would result in greater long-term costs. He also testified that the majority of the replacement contracts provided lower guaranteed rates and values than the original contracts.

¶ 80    In support of his finding that the transactions were not in the best interest of Van Dyke's clients, the Secretary primarily relies on DeWitt's exhibit 145. That document compared the aggregate dollar amounts of the original contracts to the replacement contracts, including columns for both the replacement contracts with bonuses for a total loss of $99,480.95, and the replacement contracts without bonuses, for a total loss of $297,457.06. We note, however, that when asked why he made the distinction between the bonuses or lack thereof, DeWitt stated he was told how to prepare the summaries by Finnigan, the Department's attorney. Also, in explaining how he calculated the losses, DeWitt admitted that he did not take the surrender charges into account. When Van Dyke's counsel observed that exhibit 145 was inaccurate by including the MVA but not the surrender charges, DeWitt admitted that his loss calculations did not take into consideration all of the applicable factors.

¶ 81    We observe that the final order listed the aggregate numbers from DeWitt's exhibit 147, which showed the total contract value before surrender of the original contracts to be $2,327,904.95 versus the amounts credited to the replacement contracts as $2,246,897.59, for a loss of $81,007.36. However, the bonus total on the replacement contracts was $199,565.17, which indicates an aggregate gain of $118,557.81 credited to Van Dyke's clients. We note that the Aviva replacement contracts specifically state that "the term Premium as used in this endorsement shall include the Premium Bonus." In explaining that his exhibits contained three different loss calculations of $81,007.36, $99,480.95, and $297,457.06, DeWitt stated that "the numbers varied because it depends on what assumptions you want to make and what factors you want to include in calculating a loss."

¶ 82    We find the variance in loss calculations to be nothing less than arbitrary and capricious. Here, the Department relied on an admittedly inaccurate analysis in its exhibit 145. The

surrendered contracts were never considered with both the positive MVA and the negative surrender charges as required by the issuing company's stated formula.

¶ 83     The Secretary next contends that O'Neal's PowerPoint presentation showed that the replacement contracts were not in the best interests of Van Dyke's clients. However, we observe that O'Neal made projections for the cash surrender values of the original contracts and the replacement contracts for four of Van Dyke's clients. In every case, the projections for those clients either equaled or fell far short of the actual replacement contract statements from 2012 and 2013. We further observe that, in preparing his analysis, O'Neal made several assumptions that were not supported by the actual evidence and relied on exhibits that he had never verified for accuracy. Moreover, O'Neal acknowledged that he reviewed approximately 12 pages of documents given to him by Finnigan, and he never read an original or replacement contract in full. As a consequence, he did not consider the value of benefits available in the replacement contracts that were not included in the original contracts. Based on these circumstances, we find that O'Neal's determination that the replacement contract transactions were not in the clients' best interests is arbitrary and capricious.

¶ 84     The Secretary next contends that the record supports his findings that Van Dyke violated section 12(J) through material misrepresentations and omissions. The Secretary maintains that Van Dyke engaged in fraudulent and manipulative conduct by advising his clients that they would recover any surrender penalties or other costs resulting from these transactions. The Secretary argues that Van Dyke signed suitability confirmation forms for his clients misrepresenting that there would be no surrender penalties of any kind and the rate of the charges.

¶ 85     Yet the forms that the Secretary is referring to are the same forms at issue in the separate action brought against Van Dyke by the Department of Insurance. Van Dyke explained that, in the contracts where the MVA exceeded the surrender charges, he did not list a surrender charge because the MVA offset it. The Department of Insurance reached a settlement with Van Dyke under which he paid $6000 without admitting guilt. In addition, Lamb testified that "every individual's financial situation is unique, they have different needs, they have different expectations." Accordingly, insurance producers must "very clearly consider the features in the current annuity contract versus the features in the potential replaced contract." However, the Department admittedly never conducted any such individualized analysis, nor did it consider the individual needs, financial status, or wishes of Van Dyke's insurance clients. See 14 Ill. Adm. Code 130.853 (1997); 50 Ill. Adm. Code 3120.10 (2011).

¶ 86     Consequently, we find that the evidence presented failed to establish that Van Dyke violated the Act or perpetrated a fraud on his clients with regard to the replacement transactions at issue in this case. As such, the Secretary's final order revoking Van Dyke's investment adviser registration, prohibiting him from offering or selling securities in Illinois, fining him $330,000, and requiring him to pay witness fees of $23,500 was properly reversed by the appellate court.

¶ 87                              C. Van Dyke's Claim for Attorney Fees

¶ 88     In seeking cross-relief, Van Dyke contends that he is entitled to recover his attorney fees based upon the invalidation of the Secretary's rule that indexed annuities are securities under the Act. The Secretary opposes Van Dyke's claim, arguing that it was merely interpreting the

language in the statute as it applied in this enforcement action, rather than engaging in improper rulemaking.

¶ 89  The Secretary also asserts that Van Dyke has forfeited his claim for attorney fees by failing to assert that claim in his action for administrative review in the circuit court. We do not agree. This court has held that a request for attorney fees under section 10-55(c) of the Illinois Administrative Procedure Act (Procedure Act) (5 ILCS 100/10-55(c) (West 2012)) is preserved if it is made while the court invalidating the rule maintains jurisdiction. *Illinois Department of Financial & Professional Regulation v. Rodriquez*, 2012 IL 113706, ¶ 15. Here, the circuit court affirmed the Secretary's decision. Because Van Dyke requested attorney fees in the appellate court—the court that he claims invalidated a Department rule—we will address the issue.

¶ 90  Section 10-55(c) of the Procedure Act provides as follows:

> "In any case in which a party has any administrative rule invalidated by a court for any reason, including but not limited to the agency's exceeding its statutory authority or the agency's failure to follow statutory procedures in the adoption of the rule, the court shall award the party bringing the action the reasonable expenses of the litigation, including reasonable attorney's fees." 5 ILCS 100/10-55(c) (West 2012).

Under the Procedure Act, an administrative "rule" is defined as an

> "agency statement of general applicability that implements, applies, interprets, or prescribes law or policy, but does not include (i) statements concerning only the internal management of an agency and not affecting private rights or procedures available to persons or entities outside the agency, (ii) informal advisory rulings issued under Section 5-150, (iii) intra-agency memoranda, (iv) the prescription of standardized forms, [or] (v) documents prepared or filed or actions taken by the Legislative Reference Bureau under Section 5.04 of the Legislative Reference Bureau Act." *Id.* § 1-70.

¶ 91  The purpose of section 10-55(c) "is to discourage enforcement of invalid rules and give those subject to regulation an incentive to oppose doubtful rules where compliance would otherwise be less costly than litigation." *Citizens Organizing Project v. Department of Natural Resources*, 189 Ill. 2d 593, 598-99 (2000). Because it provides for an award of attorney fees, section 10-55(c) is to be strictly construed. *Rodriquez*, 2012 IL 113706, ¶ 13 (citing *Carson Pirie Scott & Co. v. Department of Employment Security*, 131 Ill. 2d 23, 49 (1989)). An agency's erroneous interpretation of statutory language as it applies in a particular case does not constitute improper rulemaking. *Alternate Fuels, Inc. v. Director of the Illinois Environmental Protection Agency*, 215 Ill. 2d 219, 247-48 (2004).

¶ 92  In support of his claim for attorney fees under section 10-55(c), Van Dyke points out that he argued in the administrative proceeding and on judicial review that the Department had exceeded its statutory authority because indexed annuities are not securities under the Act. While we agree that indexed annuities are not securities, we do not agree that the Department lacked authority to bring the enforcement action against Van Dyke. As explained above, the Department was authorized to bring charges against Van Dyke in his capacity as an investment adviser under section 12(J). The fact that the Secretary's decision based on those charges has been held to be unfounded does not affect the Department's authority to proceed under the Act. Consequently, an award of attorney fees cannot be justified on this ground.

- 20 -

¶ 93    Van Dyke also asserts that the Department created *ad hoc* rules and unpublished procedures by employing the Department's rule that it does not "recognize a bonus as a reason for switching an annuity" and O'Neal's "age factor" as well as his "time value of money" principle. In response, the Secretary argues that its litigation of an individual enforcement action based on its analysis of the evidence, even if erroneous, does not constitute improper rulemaking under the Procedure Act. We agree with the Secretary.

¶ 94    The Secretary's interpretation of the term "security" to include indexed annuities as a form of investment contract does not constitute improper rulemaking. See *id.* In addition, DeWitt's description of a bonus as not being a recognized reason for swapping one annuity for another, O'Neal's "age factor," and his "time value of money" principle merely reflected the Department's positions with regard to the evidence presented in this case. Those positions regarding the litigation evidence similarly cannot be characterized as improper rulemaking. See *id.*; see also *Sparks & Wiewel Construction Co. v. Martin*, 250 Ill. App. 3d 955, 967-68 (1993). Accordingly, Van Dyke is not entitled to recover his attorney fees under section 10-55(c) of the Procedure Act.

¶ 95                                    III. CONCLUSION
¶ 96    For the foregoing reasons, the judgment of the appellate court is affirmed, and the judgment of the circuit court of Sangamon County is reversed.

¶ 97    Appellate court judgment affirmed.
¶ 98    Circuit court judgment reversed.