# Illinois Official Reports

## Appellate Court

---

### *Pence v. Illinois Human Rights Comm'n*, 2020 IL App (3d) 190384

---

| | |
|---|---|
| Appellate Court Caption | JESSICA PENCE, Petitioner, v. THE ILLINOIS HUMAN RIGHTS COMMISSION, THE DEPARTMENT OF HUMAN RIGHTS, and OSF ST. FRANCIS MEDICAL CENTER, Respondents. |
| District & No. | Third District<br>No. 3-19-0384 |
| Filed | May 7, 2020 |
| Decision Under Review | Petition for review of order of Illinois Human Rights Commission, No. 2016-SA-1117. |
| Judgment | Affirmed. |
| Counsel on Appeal | William W.P. Atkins, of Johnson, Bunce & Noble, P.C., Peoria, for petitioner.<br><br>Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Carson R. Griffis, Assistant Attorney General, of counsel), for respondents Illinois Human Rights Commission and Illinois Department of Human Rights.<br><br>No brief filed for other respondent. |

PRESIDING JUSTICE LYTTON delivered the judgment of the court, with opinion.
Justices O'Brien and Wright concurred in the judgment and opinion.

**OPINION**

¶ 1 Petitioner Jessica Pence appeals the decision of the Illinois Human Rights Commission (Commission), sustaining the Department of Human Rights' (Department) dismissal of her charge of employment discrimination and failure to accommodate against her employer, respondent OSF St. Francis Medical Center (OSF). On appeal, Pence claims that the decision should be reversed and the charge remanded for further investigation because (1) the Department relied on documents that were not included in Pence's personnel file, as required by the Personnel Record Review Act (820 ILCS 40/4 (West 2018)), and (2) the Commission based its decision to sustain on credibility determinations in violation of her due process rights. We confirm the Commission's order.

¶ 2                                    I. BACKGROUND

¶ 3 Under OSF's "Code of Conduct" policy, employees are required to "demonstrate courtesy, dignity and respect" in their professional interactions and refrain from intimidating, hostile, or harassing behavior. Employees who violate these policies may be disciplined in stages, or levels. Employees disciplined at Levels I and II are informed of the violation and reminded to follow the Code of Conduct; at Level III, the employee is placed on "decision-making leave"; and at Level IV, the employee is discharged.

¶ 4 In August 2007, OSF hired Pence as an executive assistant. As part of her duties, Pence maintained employee payroll, time sheets, and attendance records. Between 2007 and 2013, Pence received satisfactory evaluations. In 2013, Pence received a Level I discipline. After receiving a series of progressive disciplines, Pence received a Level IV discipline and was discharged on August 5, 2015. At that time, Pence was 59 years old and suffered from hearing loss in one ear. OSF hired a 50-year-old female with no disability to replace Pence.

¶ 5 In November 2015, Pence filed a discrimination charge with the Department under the Illinois Human Rights Act (Act) (775 ILCS 5/1-101 *et seq.* (West 2014)). In counts A, B, and D, she alleged that OSF unlawfully discharged her based on her age, gender, and disability. In count C, she claimed that OSF failed to accommodate her hearing loss disability by failing to provide her with a headset to answer the phone.

¶ 6 The Department's investigation revealed that in February 2013, Pence received a Level I discipline from her immediate supervisor, Judy Searle, for using profane or abusive language and for her disruptive behavior. According to Pence, the discipline occurred after she raised her voice during a phone call because she had hearing loss in her left ear. Pence requested a headset from Searle later that month because she could not hear when she answered the phone with her left hand. According to Pence, Searle denied her request. Pence stated that she believed the last time she asked about the headset was in October 2014.

¶ 7 Searle retired in March 2015, and Pence then began working under the supervision of Executive Director Richard Thomas. Thomas told Pence that he would handle payroll and that

it was no longer her responsibility. Pence admitted to the Department investigator that she "stormed" into an office unannounced and was given a Level II discipline by Thomas for "screaming" at the assistant managers in the room in violation of the Code of Conduct.

¶ 8    According to Thomas, Pence received "coaching," or constructive instruction, from her supervisor for aggressive and intimidating behavior in October 2010, March 2011, June 2011, July 2011, and July 2014, as required by OSF's Code of Conduct. Thomas stated that he gave Pence a Level II discipline for "approving her own time cards and for her threatening and intimating behavior toward several members of the leadership team." Thomas noted a specific instance in which Pence grabbed a list out of a coworker's hand, pointed her finger in the coworker's face, and followed the coworker down the hall while "yelling at her." On another occasion, Pence "barged" into an office where three assistant managers were working and threatened to delete an employee information spreadsheet and to hide important employee information. That incident resulted, in part, in the Level II discipline. After Pence responded to the discipline and submitted an action plan, Thomas sent Pence an e-mail outlining the expectations required of Pence relative to her pattern of behavior that had been perceived as threatening and intimidating.

¶ 9    In late March 2015, OSF hired Lisa Fuller, who became Pence's supervisor. After she was hired, Fuller met with Pence and instructed her to seek approval before working any overtime. Pence normally worked from 8 a.m. to 4:30 p.m. She agreed that she would get permission from Fuller before working past 4:30 p.m.

¶ 10    According to Fuller, Pence had to be reminded repeatedly that she needed to seek permission before incurring overtime. On May 5, 2015, Fuller disciplined Pence at a Level III for working overtime without prior approval. Pence admitted that she worked 20 minutes past her scheduled hours but said she stayed late to wait for new computers to arrive at the office.

¶ 11    Fuller also told the Department investigator that she had no knowledge of Pence's hearing loss disability. Pence did not ask Fuller for a headset for her phone, nor did she notify Fuller of the need for any accommodation.

¶ 12    On August 3, 2015, Fuller held a weekly staff meeting with the employees in her group, including Pence. During the meeting, Pence "became angry and stated that she wanted access to employee calendars and the electronic payroll database. Fuller stated that Pence "threatened to retaliate" if her access was not reinstated.

¶ 13    On August 5, 2015, OSF discharged Pence. According to Fuller, Pence was discharged because she did not display "courtesy, dignity, and respect" for her manager, which violated the Code of Conduct. Pence was replaced by Lisa Koutelis, a 50-year-old female.

¶ 14    In completing its investigation, the Department investigator spoke to Pence, Fuller, Thomas, and Jacki Fugett, counsel for OSF. The Department also reviewed numerous documents (attached to the report as Exhibits A-O), including Pence's disciplinary actions, coaching reports, Thomas's e-mail to Pence, Fuller's notes from the August 3, 2015, staff meeting, and Pence's discharge letter. None of the exhibits are included in the record on appeal.

¶ 15    In its report, the Department recommended a finding of lack of substantial evidence as to counts A, B, and D. The Department determined that there was no substantial evidence to support Pence's discriminatory claims because OSF "had a reasonable non-discriminatory reason" for discharging Pence. It noted that OSF discharged Pence for behavior that violated

its Code of Conduct and for failing to seek approval for overtime hours. The Department also recommended a finding of lack of jurisdiction as to count C, noting that Pence last requested a headset in October 2014 but failed to file a charge until November 2015. The Department concluded that count C was untimely because Pence did not file her charge within 180 days of the alleged discrimination.

¶ 16    Pence filed a request for review with the Commission. She argued that the Department ignored her statements and made impermissible credibility determinations by resolving factual disputes in OSF's favor. She further claimed that, contrary to OSF's policy requiring communication between an employee and supervisor before an initial discipline, her personnel file did not contain any record of coaching sessions by Searle before her Level I discipline.

¶ 17    In response, the Department agreed that further investigation was necessary, without elaboration, and requested that the Commission vacate the dismissal and remand for additional proceedings. In accordance with the Department's recommendation, the Commission entered an order reinstating the charge and remanding for further investigation.

¶ 18    On remand, the Department conducted additional interviews and reviewed new documents. In her interview, Pence told the Department that she received the Level I discipline because Searle misunderstood Pence's reason for raising her voice. According to Pence, she raised her voice over the phone because she suffered from hearing loss in her left ear. Pence also claimed that Searle issued the Level I discipline without any formal coaching, as required by company policy. In response, OSF submitted Searle's notes showing that Searle and Pence discussed Pence's aggressive and intimidating behavior on several occasions between October 2010 and July 2011.

¶ 19    Pence also asserted that Fuller "lied" when she said that Pence made demands and acted in an intimidating manner at the August 3, 2015, meeting. Pence did not provide an account of the conversation that occurred at the meeting. As in her initial interview, Fuller described Pence's behavior in the meeting as "angry" and "threatening." She stated that Pence demanded access to other employees' calendars, wanted her payroll duties returned to her, and threatened to retaliate against Fuller if she did not "get her way." Fuller further stated that Pence's discharge had nothing to do with her disability. Pence had been warned and her conduct deviated from the Code of Conduct requiring courtesy, dignity, and respect. The Department dismissed Pence's charge again, following the reasoning of its initial recommendation.

¶ 20    Pence filed a second request for review, arguing that the Department made factual findings unsupported by allowable evidence. Pence claimed that the documents OSF submitted in support of Searle's coaching sessions between October 2010 and July 2011 had not been disclosed to her when she received her personnel file from OSF in October 2015. As to count C, she argued that she did not admit that she last requested a headset in October 2014. She claimed that during the supplemental interview, she told the Department investigator that she "did not know the exact dates when her requests were made, but [OSF] would have email records of at least some of them."

¶ 21    The Commission analyzed Pence's claims of discrimination and lack of accommodation and sustained the Department's dismissal. In doing so, the Commission rejected Pence's argument that the Department improperly considered documents that were not in her personnel file as required under the Personnel Record Review Act. The Commission stated that it did not rely on the coaching documents from 2010 and 2011 in sustaining the Department's dismissal of counts A, B, and D. Although it considered Thomas's e-mail describing Pence's history of

threatening and intimidating behavior, the Commission noted that the March 2015 e-mail was included in Pence's file. As to count C, the Commission agreed that the failure-to-accommodate claim was untimely because Pence informed the Department that she last requested a headset in October 2014.

¶ 22                                              II. ANALYSIS
¶ 23                                    A. Personnel Record Review Act
¶ 24        Pence argues that the Department improperly relied on documents related to Searle's "coaching" sessions that occurred between October 2010 and July 2011 because OSF was prohibited from using them in the proceedings under the Personnel Record Review Act. She claims that the Department's unlawful use of such documents requires us to reverse the Commission's order sustaining the dismissal and to remand her charge for further proceedings.

¶ 25        In construing a statute, we look to the statutory language itself and give that language its plain and ordinary meaning. *Van Dyke v. White*, 2019 IL 121452, ¶ 46. "Words and phrases should not be construed in isolation but must be interpreted in light of other relevant provisions of the statute." *Id.* Courts should construe each word in its context to ensure that no term is rendered superfluous or meaningless. *Pouk v. Village of Romeoville*, 405 Ill. App. 3d 194, 197 (2010). Where the language of the statute is clear and unambiguous, courts may not resort to extrinsic aids of construction. *In re Detention of Powell*, 217 Ill. 2d 123, 135 (2005).

¶ 26        Section 2 of the Personnel Record Review Act provides that "[e]very employer shall, upon an employee's request *** , permit the employee to inspect any personnel documents which are, have been or are intended to be used in determining that employee's qualifications for employment, promotion, transfer, additional compensation, discharge or other disciplinary action." 820 ILCS 40/2 (West 2018). To promote personnel recordkeeping, section 4 provides that "[p]ersonnel record information which was not included in the personnel record but should have been as required by this Act shall not be used by an employer in a judicial or quasi-judicial proceeding." *Id.* § 4. However, information that "was not intentionally excluded from the personnel record may be used by the employer in the proceeding if the employee agrees or has been given a reasonable time to review the information." *Id.*

¶ 27        By its plain and ordinary terms, section 4 prohibits an employer from using information that was not included in an employee's personnel file in a judicial or quasi-judicial proceeding. Illinois courts have concluded that the determination of whether there is substantial evidence to support a charge of discrimination is not a quasi-judicial decision. *Graves v. Chief Legal Counsel of the Department of Human Rights*, 327 Ill. App. 3d 293, 295 (2002). Before the Department issues a formal complaint, the proceedings are investigatory, not adjudicatory. *Id.* When the Department dismisses a charge for lack of substantial evidence, the dismissal occurs during the investigatory or fact-finding stage, including the Commission's decision to sustain the dismissal. *Id.*; see also *Jabbari v. Human Rights Comm'n*, 173 Ill. App. 3d 227, 233 (1988). The Commission's determination to sustain the dismissal is not a quasi-judicial decision. The Department's dismissal and the Commission's subsequent review of that decision are essentially prosecutorial, *i.e.*, whether there is sufficient evidence to prosecute the charge. See 775 ILCS 5/7A-102(D)(2), (3) (West 2018); *id.* § 8-103(A).

¶ 28        In this case, section 4 does not apply to the Department's investigation and dismissal of Pence's charge or the Commission's review of the dismissal because those proceedings were not judicial or quasi-judicial in nature. The proceedings are only judicial or quasi-judicial if the

Department determines that there is substantial evidence and files a complaint before the Commission. See *id.* § 7A-102(D)(4). Because the proceedings before the Department and the Commission were investigatory, section 4 of the Personnel Record Review Act does not apply.

¶ 29　　Even if the Personnel Record Review Act applied, the record shows that the Commission did not rely on Searle's coaching notes in sustaining the Department's dismissal of Pence's charge. Pence admits that she received all other documents reviewed by the Department and the Commission, except those related to the coaching incidents in 2010 and 2011. The Commission's order expressly states that it did not rely on Searle's coaching notes or consider the incidents as discipline that supported Pence's discharge. Moreover, the record does not indicate that OSF relied on the coaching incidents when it discharged Pence. The Commission's decision to sustain the dismissal only discussed Pence's formal discipline—beginning with the Level I discipline on February 22, 2013, and concluding with the Level IV discharge on August 5, 2015—as its basis for sustaining the Department's dismissal. Accordingly, Pence cannot show that the Commission considered information that was not included in her personnel file in sustaining the Department's dismissal of her discrimination charge.

¶ 30　　Further, we disagree with Pence's claim that the Commission considered Searle's coaching notes when it cited Thomas's March 2015 e-mail summarizing Pence's "history of intimidating and threatening behavior." Thomas's e-mail does not reference the coaching incidents. Any conclusion that, in considering Thomas's statement, the Commission considered other inadmissible documentation is speculative. See *Wilson v. Department of Professional Regulation*, 344 Ill. App. 3d 897, 907 (2003) (agency's consideration of inadmissible report reversible only if there was "demonstrable prejudice").

¶ 31　　As the Commission noted, Thomas's e-mail was included in Pence's personnel file and submitted as an exhibit in the Department's initial investigation report. Because the information was part of the personnel file, the Department did not violate the Personnel Record Review Act by admitting it. Therefore, the dismissal did not rely on documents that should have been excluded under section 4 of the Personnel Record Review Act.

¶ 32　　　　　　　　　　　　B. Credibility Determinations

¶ 33　　Pence also claims that the Department made credibility determinations in dismissing her charge in violation of her due process rights, as prohibited by *Cooper v. Salazar*, No. 98 C 2930, 2001 WL 1351121, at *4 (N.D. Ill. Nov. 1, 2001).

¶ 34　　In *Cooper*, the crux of the question was whether the Department violated the plaintiffs' due process rights by making "credibility determinations in making substantial evidence determinations." *Id.* at *3. The federal district court concluded that the Department's determination of whether substantial evidence supported a charge was a quasi-judicial proceeding and issued an injunction against the Illinois Department of Human Rights to "cease permanently from relying on credibility determinations made without affording the rights of confrontation and cross-examination." *Id.* at *10.

¶ 35　　Since the injunction in *Cooper* was issued, the Act has been amended to remove the language allowing the Department to resolve "questions of credibility" in determining whether there is a lack of substantial evidence. In other words, section 7A-102(D)(2) of the Act no longer authorizes the Department to make credibility determinations. See Pub. Act 94-146, § 5

(eff. July 8, 2005) (amending section 7A-102(D)(2) of the Act to delete the language permitting the Department to resolve "questions of credibility").

¶ 36 Pence claims that despite the federal court injunction and the statutory amendment, the Department proceeded to make credibility determinations against her and in favor of OSF in violation of her due process rights. We disagree. In this case, the Department did not exceed its investigatory authority in determining that there was no substantial evidence to support Pence's claims of discrimination. See 775 ILCS 5/7A-102(D)(2), (3) (West 2018).

¶ 37 To establish a *prima facie* case of employment discrimination under the Act, the employee bears the burden of showing by a preponderance of the evidence that (1) she is a member of a protected class, (2) she was meeting her employer's legitimate business expectations, (3) she suffered an adverse employment action, and (4) the employer treated similarly situated employees outside the class more favorably. *Owens v. Department of Human Rights*, 403 Ill. App. 3d 899, 919 (2010). At that point, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 179 (1989). If the employer meets its burden, the employee must prove by a preponderance of the evidence that the employer's articulated reason was, in fact, a pretext for unlawful discrimination. *Id.*

¶ 38 Where an aggrieved person brings a charge under the Act, the Department investigates to determine whether the allegations are supported by substantial evidence. 775 ILCS 5/7A-102(C)(1) (West 2018). "Substantial evidence is evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a mere scintilla but may be somewhat less than a preponderance." *Id.* § 7A-102(D)(2). If the Department determines there is no substantial evidence supporting the charge, the charge is dismissed. *Id.* § 7A-102(D)(3). The charging party may then file a request for review of the dismissal with the Commission or commence an action in circuit court. *Id.*

¶ 39 Here, Pence did not submit substantial evidence that OSF's reasons for discharging her were pretextual. The interviews and documents established that OSF discharged Pence because she threatened her coworkers, approved her own timecards, worked overtime without permission, threatened to disclose and delete confidential employee information, and threatened to retaliate against her supervisor if her privileges were not restored. These facts were not disputed, and they articulated a nondiscriminatory reason for OSF's adverse employment decision. Because there was evidence that OSF's decision was motivated by Pence's history of inappropriate behavior rather than her age, gender, or disability, the Department concluded that there was a lack of substantial evidence. That determination did not require the Department to resolve questions of credibility or otherwise violate Pence's due process rights.

¶ 40 Pence also claims that the Department was required to make credibility determinations in dismissing her failure to accommodate charge. Under the Act, a party must file a charge of discrimination with the Department "[w]ithin 180 days after the date that a civil rights violation allegedly has been committed."[1] 775 ILCS 5/7A-102(A)(1) (West 2016). If a charge

---

[1]The General Assembly amended the Act to extend the time to file a charge of discrimination to 300 days, while Pence's second request for review was pending. Pub. Act 100-1066, § 5 (eff. Aug. 24, 2018) (amending 775 ILCS 5/7A-102(A)(1)). The amendment does not apply to Pence's charge. See

is untimely, the Department lacks jurisdiction to consider it. *Sangamon County Sheriff's Department v. Illinois Human Rights Comm'n*, 233 Ill. 2d 125, 141 (2009). A party cannot avoid application of the 180-day period by failing to inform the Department and the Commission of the precise dates on which the incidents occurred. *Graves*, 327 Ill. App. 3d at 299.

¶ 41    Count C of Pence's charge alleged that OSF failed to accommodate her disability when it refused to provide her with a headset for answering the phone. According to her interview, Pence last requested a headset in October 2014. In her second request for review, she asserted that she did not know the exact dates when her requests were made and stated that OSF "would have email records of at least some of them." But she failed to provide any evidence to support that claim, and the record refutes her assertion. Pence's vague statement that she continued to request a headset without precise dates does not allow her to avoid the 180-day jurisdictional limit, nor does it show that the Department made a credibility determination in dismissing the claim as untimely. See *id.*

¶ 42    In sum, the Commission relied on undisputed evidence in reviewing the Department's dismissal based on lack of substantial evidence and lack of jurisdiction. The only factual disputes appearing in the record were immaterial and would not have created substantial evidence to support Pence's charge. Thus, the Commission did not violate the *Cooper* injunction.

¶ 43                                III. CONCLUSION

¶ 44    For the foregoing reasons, the order of the Illinois Human Rights Commission is affirmed.

¶ 45    Affirmed.

---

775 ILCS 5/7A-102(L) (West 2018) ("The changes made to this Section *** apply to charges filed on or after the effective date of this amendatory Act of the 100th General Assembly.").